**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LUSITANIA GREGORIO,** | : | **Civil No. 1:20-CV-608** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,**[1] | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM OPINION**

I.  **Introduction**

For both the court and the Administrative Law Judge, the Social Security appeal of Lusitania Gregorio presented a close and difficult case. In the instant case, the plaintiff, Lusitania Gregorio ("Gregorio") applied for disability insurance benefits and a period of disability under Title II of the Social Security Act on February 28, 2017, alleging disability due to diabetes, fibromyalgia, muscle spasm, nerve pain, cholesterol, 2 herniated disc on neck pinching on her nerve, back pain, pain in both shoulders, numbness and tingling sensation on both hands, and constant

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g) Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

headaches. (Tr. 165, 166, 307-08). Gregorio alleged that she was disabled as of September 1, 2016, the day after an unfavorable decision was issued by the administrative law judge on a previous claim for disability. (Tr. 146-64, 307-08).

The evidence in this case presented the ALJ with a series of conundrums framed by a murky factual record.

First, there was a dispute regarding the degree to which Gregorio could effectively communicate in English, an issue which was relevant to her ability to readily translate her job skills and find employment. Gregorio asserted that she could not speak English and used an interpreter at the hearing before the ALJ. However, in the course of the hearing she responded to questions without the aid of the interpreter and she demonstrated English proficiency when she was naturalized as a United States citizen. Thus, the evidence on this issue was in conflict.

Similar evidentiary conflicts abounded with respect to Gregorio's medical condition. In this case, the ALJ was confronted by a number of medical opinions and findings which seemed inconsistent with one another. There were two medical expert opinions from a state agency expert and a consulting examining source. Both of these opinions concluded that Gregorio was limited to sedentary work, but the two opinions disagreed with one another regarding the nature, extent, and degree of Gregorio's limitations. Thus, the medical opinions revealed a consensus as to an

outcome, limiting Gregorio to sedentary work, but disagreement in the evaluation of Gregorio's impairments. Further complicating this medical picture was the fact that Gregorio did not provide an opinion from a treating source in support of her disability claim, but her treating physician had previously stated that she was physically capable of adopting a child and caring for an infant, a medical notation that was consistent with some significant level of physical capability to work.

Presented with a record riddled with factual conflicts and inconsistencies, after consideration of the medical records and opinion evidence, including the objective diagnostic tests and clinical findings on Gregorio's physical and mental status examinations, Gregorio's longitudinal treatment history, and her documented activities of daily living, the Administrative Law Judge ("ALJ") who reviewed this case concluded that Gregorio could perform a full range of light work and denied her disability applications. Mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.   Statement of Facts and of the Case

Lusitania Gregorio ("Gregorio") applied for disability insurance benefits and a period of disability under Title II of the Social Security Act on February 28, 2017, alleging disability due to diabetes, fibromyalgia, muscle spasm, nerve pain, cholesterol, 2 herniated disc in her neck pinching on her nerve, back pain, pain in both shoulders, numbness and tingling sensation on both hands, and constant headaches.  (Tr. 165, 166, 307-08). Gregorio alleged that she was disabled as of September 1, 2016, the day after an unfavorable decision was issued by the administrative law judge on a previous claim for disability.  (Tr. 146-64, 307-08).

Gregorio has a high school education and completed her education in the Dominican Republic. (Tr. 338). Gregorio was approximately 43 years old at the time of the alleged onset date of her disability and had prior employment as a machine operator, production line worker, wood cutter, and picker. (Tr. 166, 338).  Gregorio's date last insured is December 31, 2018 and on Gregorio's date last insured she was 45 years old. (Tr. 18).

### A. Gregorio's Language  Proficiency

Gregorio passed the English language proficiency requirement to be able to read, write, speak, and understand basic English required to obtain U.S. citizen in 2009. (Tr. 20, 129, 160). Despite passing this English proficiency test, Gregorio

4

alleges that she is now unable to communicate in English. (Doc. 18, at 22-24). At her hearing, Gregorio initially testified that she could understand no English but amended her testimony after ALJ questioning to say she was able to understand only basic English. (Tr. 125). Gregorio testified that in her last job from 2011 through 2013 she communicated with her boss in English. (Tr. 127). Gregorio then testified that she did not feel that she was able to communicate with anyone in English on any level. (Id.) When the ALJ asked the question a second time and asked the interpreter to make sure that Gregorio understood, Gregorio answered herself in English that she could only communicate "like basic things." (Id.) When the ALJ later asked at a sensitive point in the hearing whether Gregorio's adult daughter worked, Gregorio responded in English that she worked part-time. (Tr. 139).

### B. **Gregorio's Medical History**

The medical record in this case was marked by conflicts and contradictory themes but, under the deferential standard that applies to Social Security appeals, contained substantial evidence which indicates that Gregorio retained the capacity to perform some work. Gregorio has a long history of reported musculoskeletal and neuropathic pain and was determined to have the severe impairments of degenerative disc disease, fibromyalgia, and diabetes. (Tr. 18). Gregorio alleges that she is unable to lift more than 5 pounds with both hands, that she is unable to stand for more than

30 minutes, that she is unable to sit for more than 40 minutes, that she is unable to walk even a block, and that she was recommended a walker or cane but does not want to use it. (Tr. 136-37). Gregorio alleges that she is in constant pain in her neck, arms, and hands and drops things. (Tr. 132-33). She stated that the pain in her low back radiated into her leg. (Tr. 133). She also claimed that she could not lift anything and that she could not lift her head above her shoulders. (Tr. 133-34). Gregorio additionally testified that she had problems with her feet "all the time" and that she experienced migraines twice a month which last for 3-4 days.  (Tr. 134).

Gregorio testified that she had adopted a baby one year before the hearing and the baby was 3 years old at the time of the hearing. (Tr. 139). When asked if she took care of the baby, Gregorio responded that her adult daughter took care of the baby. (Tr. 139). When the ALJ asked if Gregorio's daughter worked, Gregorio responded in English without use of an interpreter that her daughter worked part-time. (Id.) When asked who took care of the baby when her daughter was working, Gregorio responded that her mother came to the house every day to look after the baby. (Tr. 139-40).

While Gregorio's treatment history shows that she had repeatedly presented to her physicians with subjective reports of pain, the clinical evidence permitted a finding that these impairments were not wholly disabling. For example, on February

6

11, 2016, Gregorio was seen by Dr. Myron Miller ("Dr. Miller") complaining of trouble in her left arm and shoulder, as well as anxiety at bedtime with trouble falling asleep. (Tr. 468). On examination her mood was good and she was "minimally anxious." (Id.) She was diagnosed with anxiety and major depression, single episode. (Id.) On February 19, 2016, an X-Ray of the Cervical and lumbar spines showed moderate degenerative changes at C5-T1, most severe at C6-7, with no significant dynamic instability, and minimal degenerative changes in the upper lumbar spine. (Tr. 546-47).

At a February 22, 2016 visit at HMC, it was indicated that Gregorio's workers compensation claim was to be closed that month and she was seeking a second opinion. (Tr. 558). An MRI of the cervical spine taken on September 16, 2015 was reviewed and it was noted that it showed 3 levels of degenerative disc disease with a posterior central disc protrusion at C3-4, C5-6 with right greater than left neuroforaminal narrowing. (Tr. 459). During a May 12, 2016 visit, Gregorio was noted to be "doing fair" with "okay" nerves and mood. (Tr. 472).

On May 25, 2016, Gregorio was seen by resident physician Pradeep Singanaliur, MD, who stated that Gregorio had a normal musculoskeletal examination with full range of motion and strength, as well as negative SLR but that on neurological examination Gregorio complained of decreased sensation. (Tr. 478).

Dr. Singanaliur recommended that Gregorio be referred to the rheumatology clinic. (Id.)

On September 1, 2016, Gregorio was seen at the Good Samaritan Hospital ER complaining of a headache that had lasted for 24 hours. (Tr. 485). It was noted that Gregorio was last seen in the ER on September 20, 2015, and she was given Benadryl and Reglan and stated that she improved thereafter. (Id.) Gregorio was released in stable condition with a tension headache. (Tr. 486). On September 13, 2016, Gregorio appeared at Dr. Miller's office and was noted to be in no apparent distress but to be "quite tender over the cervical paraspinal muscles bilaterally." (Tr. 487).

On October 11, 2016, Plaintiff was seen in the Hershey Medical Center ("HMC") Rheumatology Clinic on referral from Myron Miller, MD. (Tr. 413). She was noted to have injured her neck at work in 2013 and to have been treated by a chiropractor. (Id.) It was noted that she had been seen by Dr. Gordon at HMC who stated that she had cervical stenosis and some cervical disc bulging but was not a candidate for surgery. (Id.) On examination, it was noted that Gregorio subjectively complained of decreased sensation in the hands and feet but objectively was intact. (Tr. 415). Gait was noted to be non-antalgic and there was no swelling, warmth or limited range of motion of the joints in her hands. (Id.) Gregorio had 18/18 trigger points and had mild tenderness of the basal joint left hand. (Id.) Nerve conduction

8

studies of the LUE were normal. (Id.) Gregorio was given a tentative diagnosis of fibromyalgia. (Tr. 416).

On October 18, 2016, Good Samaritan Hospital Physical Therapy notes, John Kearns, PA, it was noted that the referral was for aquatic therapy. (Tr. 437). It was noted that Gregorio complained of difficulty with car transfer, washing dishes, and getting dishes from overhead cabinets. (Id.) However, Gregorio cancelled appointments or failed to show up for appointments on ten occasions, (Tr. 442, 444, 445, 446, 450, 451, 452, 453, 455, 456), and her treatment was cancelled due to non-compliance. (Tr. 456, 458)

On June 5, 2017, Gregorio was examined by Spencer Long, MD ("Dr. Long") at the request of the Commissioner. (Tr. 563-585). Gregorio was present with her niece, who she said lives with her. (Tr. 565). Gregorio advised Dr. Long that she was diagnosed with 2 herniated discs in 2013, was diagnosed with carpal tunnel syndrome in 2015 and was considering surgery, was diagnosed with type 2 diabetes and diabetic neuropathy in 2010, and was diagnosed with fibromyalgia in 2015. Gregorio was 5'1" and weighed 152 pounds. (Tr. 566). On examination Gregorio was in no apparent distress, had a normal gait, was unable to walk on heels and toes secondary to pack pain, was able to squat ¼ of full, used no assistive device, had a normal stance, did not need help getting on and off the table, and was able to rise

9

without difficulty.  (Tr. 567). SLR was positive in the left at 30 degrees and positive on the right at 60 degrees. (Id.) Joints were stable and nontender with no swelling, heat or redness. (Id.) Additionally, 13 of 18 trigger points for fibromyalgia were positive, her grip strength was 4/5 bilaterally, and her fine motor movement of zipping, tying, and buttoning were noted to be good. (Id.)

Dr. Long diagnosed Gregorio with cervical degenerative disc disease, bilateral carpal tunnel syndrome, diabetic neuropathy (noting no sensory abnormalities on exam), diabetes mellitis, fibromyalgia, endometriosis, and asthma. (Tr. 568). Dr. Long opined that her prognosis was "fair" and concluded that Gregorio could lift up to 10 pounds occasionally and frequently.  (Tr. 571). He further opined that Gregorio could sit for 8 hours in an 8 hour day and stand or walk for 1 hour each in an 8 hour day; that Gregorio could never reach overhead; could occasionally reach in general, handle and finger, and could frequently finger. (Tr. 573). Dr. Long stated that Gregorio could never climb ladders, ropes or stairs and could never crouch or crawl, but could occasionally climb stairs and ramps, balance, stoop, and kneel. (Id.)

On June 16, 2017, state agency analyst Jennifer Wilson, DO ("Dr. Wilson") reviewed Gregorio's file and rendered an opinion.  (Tr. 169-71). Dr. Wilson opined that based upon the medical record and the listed activities of daily living, Gregorio's impairments could be expected to produce pain and weakness but that her allegations

10

of the intensity, frequency, and functional limitation caused by the symptoms was not substantiated by objective medical evidence and that her allegations were only partially credible. (Tr. 169). According to Dr. Wilson, Gregorio could stand or walk for 2 hours in an eight-hour day, sit for 6 hours in an 8-hour day, and could lift or carry up to 10 pounds both frequently and occasionally. (Tr. 170). Dr. Wilson also opined that Gregorio had no limitation with regard to pushing or pulling; and had no limitation with regard to postural, manipulative, visual, communicative, or environmental limitations. (Id.) In reaching these conclusions Dr. Wilson noted that she considered the rheumatology examination of October 2016 which showed normal strength, normal reflexes, negative SLR, normal gain, subjective reports of decreased sensation, and 18/18 trigger points; the fact that Gregorio's physical therapy was discontinued for non-compliance; a BMI of 28.5 with good blood sugars and blood pressure of 100/70, with tenderness over the knee and SI joints; a normal x-ray of the knee; and the consultative report showing normal gait, no assistive devices, ¼ squat, 13/18 trigger points, normal strength, 4/5 grip strength, positive SLR, the ability to perform fine motor activities, and a cervical spine x-ray showing mild degenerative disc disease.  (Tr. 170-71).

Dr. Wilson also considered the opinion of Dr. Long but noted that the opinion relied heavily on Gregorio's subjective complaints and was not supported by the

evidence. (Tr. 172). Dr. Wilson found the opinion to be without support from Dr. Long and thus less persuasive. (Id.) Dr. Wilson opined that Dr. Long's opinion was an overestimation of the severity of Gregorio's restrictions and limitations. (Id.)

Other clinical records from 2017 seemed to confirm that Gregorio retained the capacity to perform some work. Thus, on June 9, 2017, an EEG was performed at Hartman Rehab Associates which indicated functional range of motion, functional strength, no atrophy, and normal electrodiagnostic testing of the upper extremities. (Tr. 591-92). On June 17, 2017, ophthalmologist David Streisfeld, MD opined that Gregorio had good vision with no evidence of diabetic retinopathy. (Tr. 593). On June 20, 2017, Gregorio presented to Dr. Miller, asking him to complete a form stating that she was capable of adopting a child. (Tr. 594). It was noted that her mood was good, and she showed no sign of anxiety. (Id.) A form was completed by Dr. Miller which indicated that Gregorio had no significant physical findings, was free of communicable disease, had a good prognosis for continued health, was physically capable of caring for children, and had depression which was controlled with medication. (Tr. 596). On September 11, 2017 Dr. Miller was contacted by the adoption agency, seeking information. (Tr. 600). When asked if Gregorio's chronic pain issues or diabetes would cause issues in parenting, he stated that they were being treated and would not preclude parenting. (Id.)

Throughout 2017, Gregorio received fairly conservative treatment for her back and neck impairments, consisting of trigger point injections and physical therapy. Moreover, x-rays and EMG studies generally did not reveal any severe impairments. (Tr. 604-25, 639). Moreover, physical therapy records indicated that Gregorio had limited English but was able to verbally confirm understanding of pain management education. (Tr. 657, 662).

In 2018, Gregorio continued to receive trigger point injections.  (Tr. 627-28, 630-31, 633-34, 705). An MRI of the lumbar spine was performed on June 26, 2018 indicated mild degenerative changes, mild disc bulge at L1-2 with no significant effect on the thecal sac and a subtle protruded osteophyte mildly abutting the existing L5 nerve root from the right neural foramen at L5-S1. (Tr. 702). On July 22, 2018 Gregorio was referred for physical therapy and a July 5, 2018 note indicates that Gregorio showed moderate functional limitation and presented with complaints of difficulty lifting and sleeping. (Tr. 714). Gregorio complained that she had decreased strength, decreased endurance, and decreased range of motion and noted that a barrier to progress was the fact that she had difficulty carrying her 18-pound infant. (Tr. 714, 727). It was noted that Gregorio was independent with activities of daily living but needed help to mop, sweep, and lift baskets. (Tr. 715).

13

It was against this factual backdrop, marked by competing claims and conflicting evidence, that Gregorio's disability claim was evaluated by the ALJ.

## C. **Administrative Proceedings**

Gregorio applied for disability insurance benefits on February 28, 2017, and her application for benefits was denied on June 19, 2017. (Tr. 16). Thereafter, Gregorio filed a written request for a hearing on July 10, 2017, and a hearing was held on November 19, 2018. (Tr. 16, 187-88). At the hearing, both Gregorio and a Vocational Expert testified. (Tr. 16). By a decision dated January 24, 2019, the ALJ denied Gregorio's application for benefits. (Tr. 12-29).

In that decision, the ALJ first concluded that Gregorio met the insured status requirements of the Social Security Act through December 31, 2018 and had not engaged in any substantial gainful activity between her alleged onset date of disability of September 1, 2016 and her date last insured of December 31, 2018. (Tr. 18). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Gregorio had the following severe impairments: degenerative disc disease, diabetes, and fibromyalgia. (Id.) The ALJ concluded that these impairments significantly limited Gregorio's ability to perform basic work activities. (Id.) Additionally, the ALJ found that mild obstructive sleep apnea was not a severe impairment. (Id.) At Step 3, the ALJ determined that Gregorio did not have an

impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 19).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity (RFC), considering Gregorio's limitations from her impairments:

> After careful consideration of the entire record, the undersigned finds that through the date last insured, the claimant has the [RFC] to perform the full range of light work as defined in 20 C.F.R. 404.1567(b).

(Tr. 19).

Specifically, in making the RFC determination, the ALJ considered the testimony of Gregorio that she became disabled due to diabetes, fibromyalgia, nerve pain, muscle spasms, cholesterol, two herniated discs in the neck, back pain, pain in both shoulders, numbness and tingling in both hands, and constant headaches. (Tr. 19). The ALJ also considered Gregorio's alleged language barriers and found that Gregorio testified that she passed the English proficiency exam necessary to qualify for United States citizenship, and that Gregorio testified that she can communicate basic things in English. (Tr. 20).

The ALJ also considered the medical evidence of record, focusing upon the internally inconsistent and conflicting opinions of Dr. Long and Dr. Wilson. On this score the ALJ afforded little weight to the opinion of the consultative examiner Dr. Long. The ALJ found that Dr. Long's finding of positive straight leg raising was not

consistent with the longitudinal record in which both the primary care physician and the physical medicine and rehabilitation provider both consistently found negative straight leg raising. (Tr. 24). The ALJ found that the hand and foot limitations that Dr. Long described were in conflict with the objective findings on electrodiagnostic testing as well as treatment examinations which revealed no objective evidence of sensory or motor deficit. (Id.) The ALJ found Dr. Long's opinions that Gregorio cannot operate a motor vehicle inconsistent with Gregorio's own testimony that she does in fact drive a car. (Id.)

The ALJ also gave Dr. Wilson's opinion little weight. (Tr. 23). The ALJ found that Dr. Wilson's views did not correspond to the treatment record as a whole and did not correspond to the treatment records which Dr. Wilson cited. (Tr. 23-24). The ALJ concluded that Dr. Wilson erred in citing the opinion and examination of Dr. Long when Dr. Wilson herself had found Dr. Long's opinion to be unpersuasive and not supported by the record. (Tr. 24).

The ALJ did not give any weight to the statement of the treating physician, Dr. Miller, that Gregorio was physically capable of caring for a child and noted good prognosis for continued health. However, the ALJ specifically recited this evidence in the decision, noting that the statement was consistent with physical findings made within the same time period when Dr. Miller opined that there was no evidence of

gross sensory or motor deficits bilaterally and that straight leg raising was negative. (Tr. 22-23).

Having arrived at this RFC assessment for Gregorio based upon an evaluation of these various conflicting medical opinions, the ALJ found at Step 4 that Gregorio was capable of returning to her past relevant work as a machine operator and an assembler, both as they are customarily performed and as they were actually performed. (Tr. 24-25). The ALJ then made an alternate finding at Step 5 that, while Gregorio was capable of returning to her past relevant work, she was a younger individual who was able to communicate in English and who had a limited education and that an application of the Medical-Vocational Rules 20 CFR Part 404, Subpart P, Appendix 2, would result in a finding that Gregorio was not disabled. In making this finding, the ALJ noted that Gregorio had passed the English language proficiency test of the U.S. citizenship examination and that she rejected the argument of Gregorio's counsel that her English language skills had regressed in the 10 years since. (Tr. 25). Accordingly, the ALJ concluded that Gregorio did not meet the stringent standard for disability set by the Act and denied her disability claims. (Id.)

This appeal followed. (Doc. 1). On appeal, Gregorio contends that the ALJ's decision is not based on substantial evidence required under 42 U.S.C. § 405(g) and

gives four separate grounds for appeal: that the ALJ erred in failing to consider the limitations of Gregorio's severe impairments of degenerative disc disease and fibromyalgia; that the ALJ erred in failing to consider the limitations caused by Gregorio's sleep disorder, anxiety, obstructive sleep apnea, cervical spinal stenosis, migraine headaches, diabetic neuropathy, obesity, and endometriosis; that the ALJ erred in finding that Gregorio was capable of performing work at the light exertional level when Dr. Long and Dr. Wilson found her capable of performing work at the sedentary level; and that the ALJ erred in finding that Gregorio was capable of communicating in English because Gregorio was able to pass the English proficiency portion of the United States citizenship test. (Doc. 18, at 1-2). This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, under the highly deferential standard of review that applies here, the Commissioner's final decision is affirmed.

## III.    <u>Discussion</u>

### A.    <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200

18

(3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-

evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid</u>.; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law.  <u>See</u> <u>Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

20

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.     Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a).  To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R. §404.1520(a).   Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3)

whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an

assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when

making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064.  Once

this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.   20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981).   Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id</u>. at 706-707.   In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec</u>., 181 F. 3d 429, 433 (3d Cir. 1999).

**C.** **Legal Benchmarks for the ALJ's Assessment of Medical Opinion and Lay Evidence**

The Commissioner's regulations also set standards for the evaluation of medical evidence, and define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to accord to competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions are generally entitled to more weight. See 20 C.F.R. §404.1527(c)(2)("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); see also SSR 96-2p, 1996 WL

27

374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c).

At the initial level of administrative review, State agency medical and psychological consultants may act as adjudicators. See SSR 96-5p, 1996 WL 374183 at *4. As such, they do not express opinions; they make findings of fact that become part of the determination. Id. However, 20 C.F.R. §404.1527(e) provides that at the ALJ and Appeals Council levels of the administrative review process, findings by nonexamining State agency medical and psychological consultants should be

evaluated as medical opinion evidence. Therefore, ALJs must consider these opinions as expert opinion evidence by nonexamining physicians and must address these opinions in their decisions. SSR 96-5p, 1996 WL 374183 at *6. Opinions by State agency consultants can be given weight "only insofar as they are supported by evidence in the case record." SSR 96-6p, 1996 WL 374180 at *2. In appropriate circumstances, opinions from nonexamining State agency medical consultants may be entitled to greater weight than the opinions of treating or examining sources. Id. at *3.

Oftentimes, as in this case, an ALJ must evaluate medical opinions and records tendered by both treating and non-treating sources. Judicial review of this aspect of ALJ decision-making is guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, "[w]here, . . . , the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate,

articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV– 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV– 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

Similar considerations govern an ALJ's evaluation of lay testimony. When evaluating lay testimony regarding a claimant's reported degree of disability, we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir. 2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994) (citing Stewart v. Sec'y of Health, Education and Welfare, 714 F.2d 287, 290 (3d Cir. 1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir. 2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject

30

evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D. Pa. 2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

McKean v. Colvin, 150 F.Supp.3d 406, 415–16 (M.D. Pa. 2015) (footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529,

416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler, 667 F.3d at 363 (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled."). It is well-settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. § 404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire

case record. 20 C.F.R. § 404.1529(c); SSR 16–3p. This includes but is not limited to: medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24,

2014); Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015).

D.   **The ALJ's Decision in this Case is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson v. Perales, 402 U.S. 389, 401 (1971), and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Gregorio could perform a full range of light work and was not disabled.

1.   **The ALJ did not err in considering limitations caused by Gregorio's severe impairments of degenerative disc disease and fibromyalgia.**

Gregorio's first claim of error challenges the ALJ's consideration of the limitations Gregorio experiences as a result of her severe impairments of

34

degenerative disc disease, diabetes, and fibromyalgia. (Doc. 18, at 11-16). Gregorio

alleges specifically that the ALJ failed to set forth postural limitations, did not

include a sit/stand option, did not include any non-exertional limitations related to

difficulty in concentrating, did not include any limitations as to ability to remain on

task, did not include any provisions with regard to absenteeism, and did not reference

any medical opinion of record that conflicted with the findings of Dr. Long or Dr.

Wilson, which limited Gregorio to sedentary work.  (Doc. 18, at 13-14).

While Gregorio notes that she has repeatedly complained of pain and

limitations, her medical record, activities of daily living, and hearing testimony

provided a basis for concluding that she could perform some work. As the ALJ

observed:

> [T]he claimant's statements about the intensity, persistence and
> limiting effects of these symptoms are not entirely consistent with the
> medical record and other evidence in the record for the reasons
> explained in this decision.  As for the claimant's statements about the
> intensity, persistence and limiting effect of her symptoms they are
> inconsistent with the relatively benign clinical and laboratory signs and
> findings of record and the treatment history.  In terms of recent
> treatment, it is conservative in nature and essentially limited to the use
> of medication.

(Tr. 21).

In our view, this aspect of the ALJ's decision was supported by substantial

evidence; that is, "'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Biestek, 139 S. Ct. at 1154. Thus, while Gregorio notes that she has taken both narcotic pain medication in the past as well as trigger point injections, those treatment modalities are conservative in nature. Her course of physical therapy is also considered conservative in nature, yet Gregorio did not complete this conservative course of treatment. As the ALJ pointed out, there has been no need for emergency room visits nor have there been any indications that Gregorio would need surgery of any kind. (Id.)

While Gregorio's physical impairments were confirmed by diagnostic tests, here treatment records did not compel a finding of disability. For example, the medical records of Dr. Miller note that Gregorio's diabetes was well controlled. (Tr. 468, 472, 494, 512). Likewise, Gregorio alleges that she is unable to lift more than 5 pounds with both hands, that she is unable to stand for more than 30 minutes, that she is unable to sit for more than 40 minutes, that she is unable to walk even a block, and that she was recommended a walker or cane but does not want to use it. (Tr. 136-37). However, medical records indicated that Gregorio had a non-antalgic gait and did not need any assistive device.[2]

Further, in 2016, Dr. Pradeep Singanaliur observed that Gregorio had a

---

[2] No prescription for a cane or walker is found in the record, nor is any reference that any medical source mentioned the use of an assistive device.

normal musculoskeletal examination, normal gait, and negative SLR. (Tr. 478). On examination in the HMC Rheumatology Clinic that same year it was noted that subjectively complained of decreased sensation of the hands and feet but was objectively intact and that her gait was non-antalgic. (Tr. 415). In June of 2017, Dr. Long noted that Gregorio's gait was normal, that she used no assistive device, and that she needed no help getting on and off the table. (Tr. 566-67). In assessing Gregorio's complaints of diabetic neuropathy, Dr. Long noted that Gregorio had no sensory abnormalities on examination. (Tr. 571). In June of 2017, Dr. Miller, who had a lengthy treatment history with Gregorio, opined that she had no significant physical findings and was capable of performing all of the physical and mental duties necessary to parent a foster child. (Tr. 596).[34] He opined that she had a good prognosis for continued health. (Id.) In October of 2018, a physical therapy note indicates that Gregorio had normal gait, range of motion, and strength. (Tr. 71).

Gregorio's hearing testimony also raised questions regarding the severity of her impairments. For example, she stated that she was only able to lift 5 pounds with

---

[3] The DOT listing for a person who cares for a child in a private home is that of a "child monitor" DOT 301.677-010 is a medium level exertion position.
[4] We distinguish this circumstance from that in which an applicant for disability who is already a parent continues to do so with assistance after becoming disabled, as Dr. Miller completed a form which requested information as to whether Gregorio was herself physically capable of completing those tasks.

both hands, but her treating physician Dr. Miller advised that Gregorio is capable of doing what is physically necessary to be the foster parent of an infant, as noted above. Gregorio also indicated that she never lifted the baby, but instead the baby was cared for by either her daughter or her mother, who would come to her house every day to care for the baby when her daughter was working. (Tr. 139-40). However, physical therapy notes indicated that Gregorio stated that one of her issues was that she had difficulty when she "carried" her 18-pound infant. (Tr. 727). The physical therapy notes indicate that Gregorio was capable of lifting and carrying in excess of 5-10 pounds.

In addition, the medical record presented contradictory evidence concerning the degree to which Gregorio's neuropathy was disabling. On February 19, 2016, an X-Ray of the Cervical and lumbar spines showed moderate degenerative changes at C5-T1, most severe at C6-7, with no significant dynamic instability and minimal degenerative changes in the upper lumbar spine. (Tr. 546-47). An MRI of the cervical spine taken on September 16, 2015 was reviewed and it was notes that it showed 3 levels of degenerative disc disease with a posterior central disc protrusion at C3-4, C5-6 with right greater than left neuroforaminal narrowing. (Tr. 459). On June 9, 2017, an EMG was performed at Hartman Rehab Associates which indicated functional range of motion, functional strength, no atrophy, and normal

electrodiagnostic testing of the upper extremities. (Tr. 591-92). On December 9, 2017, an X-ray of the lower back was performed at Good Samaritan Hospital which showed no compression fracture or misalignment, mild bilateral L5-S1 facet arthrosis and normal disc spaces. (Tr. 639).

On December 12, 2017, an EMG study was done at HMC of the lower extremities. (Tr. 605-06). Normal findings were noted. (Tr. 606). An MRI of the lumbar spine was performed on June 26, 2018, which indicated mild degenerative changes, mild disc bulge at L1-2 with no significant effect on the thecal sac and a subtle protruded osteophyte mildly abutting the existing L5 nerve root from the right neural foramen at L5-S1. (Tr. 702). On December 28, 2018, an MRI of the cervical spine was performed. (Tr. 68-69). It was noted to have similar findings to the 2015 MRI, with degenerative changes in the cervical spine, moderate stenosis at C6-7 and mild stenosis at C4-5 but no high grade neural foraminal stenosis at any level. (Tr. 69).

Each of these diagnostic tests was noted by the ALJ, as was the fact that on examination there were no physical findings to support Gregorio's subjective complaints of pain. (Tr. 21-24). Thus, here we find that the ALJ has given an adequate explanation of his reasoning regarding Gregorio's severe impairments, and substantial evidence, that is, "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion," Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019), supported these factual findings. Under this deferential standard of review there are no grounds for remand in this regard.

### 2. The ALJ did not err in considering limitations caused by Gregorio's sleep disorder, anxiety, obstructive sleep apnea, cervical spinal stenosis, migraine headaches, diabetic neuropathy, obesity, and endometriosis.

Gregorio also appears to make an argument that at Step 2 the ALJ erred in finding some of her alleged impairments to be nonsevere or failed to make a finding as to whether they were severe. Gregorio argues that the ALJ erred because he "makes little or no mention of Claimant's sleep disorder, anxiety, obstructive sleep apnea, cervical spinal stenosis, migraine headaches, diabetic neuropathy, obesity or endometriosis." (Doc 18, at 17). We find Gregorio's argument unpersuasive and in any event conclude that any failure to further address the severity of these conditions constituted, at most, harmless error.

At step-two of the sequential analysis, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). An impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities. 20 C.F.R. 404.1520(c). An impairment is severe if it is "something beyond a 'slight abnormality which would have no more

than a minimal effect on the Plaintiff's ability to do basic work activities. <u>McCrea v. Comm'r of Soc. Sec.</u>, 370 F.3d at 357, 360 (3d Cir. 2004) (quoting SSR 85-28, 1985 WL 56856 (1985)). The Court of Appeals is clear that the step-two inquiry is a de minimis screening device used to cast out meritless claims. <u>McCrea</u>, 370 F.3d at 360; <u>Newell v. Comm'r of Soc. Sec.</u>, 347 F.3d 541, 546 (3d Cir. 2003). The burden is on the claimant to show that an impairment qualifies as severe. <u>Bowen</u>, 482 U.S. at 146, 107 S.Ct. 2287. <u>Stancavage v. Saul</u>, 469 F. Supp. 3d 311, 331 (M.D. Pa. 2020). Further,

> [I]t is well-settled that: "[E]ven if an ALJ erroneously determines at step two that one impairment is not 'severe,' the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five." <u>Naomi Rodriguez v. Berryhill</u>, No. 1:18-CV-684, 2019 WL 2296582, at *10 (M.D. Pa. May 30, 2019) (citing cases).

<u>Id.</u> at 332.

Here, we cannot find any prejudicial error in the ALJ's consideration of these remaining medical conditions. While the ALJ's decision did not clearly delineate all of these conditions as nonsevere at Step 2, it is evident that the ALJ did consider these conditions throughout the sequential analysis of her claim. For example, the ALJ noted Gregorio's complaints of neuropathy from diabetes, testimony regarding migraine headaches, problems sleeping, constant pain and cramps, and problems with concentrating. (Tr. 20-21). The ALJ went on however to conclude that she

41

found Gregorio's testimony to be inconsistent with the medical evidence as noted above. (Tr. 21). With regard to Gregorio's complaints of migraine headaches, there was only one instance in the record in which Gregorio needed to seek treatment for a migraine, which took place in September of 2016. (Tr. 485). In March of 2018, when Gregorio was adopting a child, she reported to Dr. Miller that Imitrex was working to lessen her headaches. (Tr. 607). In July of 2018, Dr. Miller noted that Gregorio's migraine headaches were "under control." (Tr. 719).

As for Gregorio's allegations of anxiety, the record indicated that Gregorio did not seek formal treatment from a psychiatrist or psychologist for mental health issues and instead relied upon obtaining medication from Dr. Miller, her primary doctor. Dr. Miller's own notes documented Gregorio's complaints of anxiety but did not reflect that it is a severe impairment. On February 11, 2016, Gregorio was diagnosed by Dr. Miller as suffering from anxiety at bedtime falling asleep, although he notes that she was "minimally anxious" on examination. (Tr. 468).  In June of 2016, Dr. Miller stated that Gregorio's "nerves" were "okay." (Tr. 472). In a June 2017 treatment note Dr. Miller indicated that Gregorio showed no sign of anxiety. (Tr. 594). In June of 2017, when asked if Gregorio had any mental health issues as part of her adoption questionnaire, Dr. Miller stated that Gregorio had depression which was controlled with medication and did not even mention anxiety. (Tr. 596).

In July of 2018, Dr. Miller stated that Gregorio's nerves were "fair." (Tr. 719).

Gregorio was seen in November of 2018 at HMC for trigger point injection and was noted on mental status examination to have appropriate mood and affect. (Tr. 71). A note from Dr. Miller regarding Gregorio's December 2018 visit indicated that Gregorio reported that her nerves were "fair" but that no anxiety was noted on examination. (Tr. 86-87). Further, the ALJ's expressly concluded that Gregorio's mild sleep apnea was not a severe impairment. (Tr. 18). Substantial evidence supported this finding since on  January 11, 2017, Gregorio was seen in the HMC Sleep Center for a sleep study. (Tr. 504). It was determined after study that Gregorio tolerated CPAP well and showed a normal EKG and EEG.  (Tr. 507.)   Gregorio's oxygen saturation was at 99% and her sleep cycles normal after use of a CPAP machine.  (Id.)

Finally, with regard to the issue of obesity, Gregorio did not meet the criteria to be found obese. Not only did Gregorio fail to allege obesity as an impairment when she filed her claim, but she further fails to articulate any specific manner in which obesity would have affected her treatment or condition. In 2019, a Policy Interpretation Ruling was added to the Social Security Rulings. SSR 19-2p: Title II and XVI:  Evaluating Cases Involving Obesity.  The SSR provides that by definition:

> Obesity is a complex disorder characterized by an excessive amount of body  fat,  and  is  generally  the  result  of  many  factors  including

environment, family history and genetics, metabolism, and behavior. Health care practitioners diagnose obesity based on a person's medical history, physical examinations, and body mass index (BMI). For adults, BMI is a person's weight in kilograms divided by the square of his or her height in meters (kg/m2). People with obesity weigh more than what is considered the healthy weight for their height. In the medical community, obesity is defined as a BMI of 30.0 or higher.

(Id.)

Gregorio stands at 5 feet 2 inches tall.  (Tr. 165).  At the time that Gregorio filed her claim, she weighed 160 pounds and had a body mass index of 29.3.  (Id.) Further, it appears that on March 24, 2017, Gregorio had a BMI of 28.5.  (Tr. 23.) Thus, Gregorio did not fit the criteria to establish obesity.  Therefore, we cannot find that the ALJ erred in failing to address obesity severe impairment in this case.

3. **The ALJ did not err in setting forth his determination of Gregorio's Residual Functional Capacity assessment.**

The Court of Appeals has ruled that the ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations. Chandler, 667 F.3d at 361. The ALJ is charged with a duty to evaluate all the medical opinions in the record under the factors set forth in the regulations and to resolve any conflicts. 20 C.F.R. § 404.1527. An ALJ may give an opinion less weight or no weight if it does not present relevant evidence or a sufficient explanation to support it, or if it is inconsistent with the record as a whole. 20 C.F.R. § 404.1527(c). The ALJ may choose which medical evidence to credit and

44

which to reject as long as there is a rational basis for the decision. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).

This case presented the ALJ with a challenging factual scenario. There was no treating source opinion provided by the plaintiff to support her claim of disability although, on June 27, 2017 and September 11, 2017, Dr. Miller opined that Gregorio was physically and mentally capable of completing all tasks necessary to care for an infant as a foster or adoptive parent, a task which is considered medium exertional work as defined by the Dictionary of Occupational Titles. Therefore, Gregorio invites us to discount this evidentiary enigma and give greater weight to the opinions of a one-time examining physician and a non-examining state agency analyst, both of whom suggested for very different reasons that Gregorio was limited to sedentary work. (Doc. 18, at 19-22).

Presented with this odd constellation of evidence, the ALJ found that the opinions of Dr. Long and Wilson were inconsistent with the record, including an MRI which was performed after their opinions were rendered, and that their opinions were based in large part upon the subjective complaints of Gregorio, which the ALJ had determined to lack credibility. (Tr. 23-24). The ALJ articulated that the opinion of Dr. Wilson was inconsistent with treatment records, noting that Dr. Wilson cited the following evidence which contradicted her opinion: a rheumatology examination

which showed full strength, normal reflexes, negative SLR, a non-antalgic gait and subjective complaints of decreased sensation over the hands and feet; a history of non-compliance with scheduled physical therapy which resulted in discharge from the treatment; a treatment note indicating a BMI less than 30, normal blood sugars, and diagnosis of diabetes with neuropathy, fibromyalgia; and a normal left knee x-ray. (Tr. 23). The ALJ noted that the diagnostic testing revealed that Gregorio does not suffer from neuropathy, and an MRI of the lumbar spine subsequent to Dr. Wilson's opinion indicated that Gregorio has only mild abnormalities. (Tr. 24)

With regard to the opinion of Dr. Long, the ALJ explained that this opinion conflicted with the longitudinal record. While Dr. Long indicated that Gregorio had hand and foot limitations, they were inconsistent with the negative electrodiagnostic testing results which indicated no neuropathy or radiculopathy, or the examination results of Dr. Miller's examination which revealed no evidence of gross sensory or motor deficits of the upper or lower extremities. (Tr. 24). The ALJ noted as well that Dr. Long's opinions were rendered prior to the MRI of the lumbar spine and were inconsistent with its findings. (Id.) Further, the ALJ observed that Dr. Wilson, in reviewing Dr. Long's opinions, found that they were unpersuasive and not supported by the objective findings.  (Id.)

Although the ALJ did not have the benefit of any medical opinion from Dr. Miller, who had treated Gregorio for many years, he did detail Dr. Miller's statement that Gregorio had no significant physical impairments which prevented her from undertaking full-time child care, and that although she suffered from diabetes and pain syndromes they were being treated with medication. (Tr. 22-23). The ALJ noted as well that Dr. Miller's examination of Gregorio showed no evidence of gross sensory or motor deficits bilaterally. (Tr. 23, 24).

This profoundly mixed and equivocal evidentiary record presented the ALJ, and this court, with a close and difficult case. The clinical evidence and statements from Gregorio's treating source strongly suggested a capacity for work since the doctor stated that Gregorio was physically capable of full-time infant care. Moreover, that treating source provided no medical opinion which suggested that Gregorio was disabled. In contrast, the consultative and nonexamining medical sources provided opinions which reached similar results, concluding that Gregorio could perform sedentary work, but reached these conclusions through what the ALJ determined to be flawed analyses. Given clinical evidence from a treating source indicating  that Gregorio had significant physical capabilities, and flawed analyses by non-treating and nonexamining sources which found that she could perform sedentary work, we cannot say that the ALJ erred in finding that Gregorio was able

47

to engage in a limited scope of light work and substantial evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019), supported this determination.

Assessing a claimant's RFC falls within the purview of the ALJ. 20 C.F.R. § 404.1546(c); SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996). "[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" Burnett, 220 F.3d at 121 (quoting Hartranft v. Apfel, 181 F.3d 358, 359 (3d Cir. 1999)). Specifically, one's RFC reflects the *most* that an individual can still do, despite his or her limitations, and is used at steps four and five to evaluate the claimant's case. 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8P, 1996 WL 374184 at *2. In crafting the RFC, the ALJ must consider all the evidence of record, including medical signs and laboratory findings, daily activities, medical source statements, and a claimant's medical history. SSR 96-8p, 1996 WL 374184, at *5; see also Mullin v. Apfel, 79 F. Supp. 2d 544, 548 (E.D. Pa. 2000). An ALJ's RFC findings, however, must be supported by the medical evidence. Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986). "[O]nce the ALJ has made this [RFC] determination, [a court's] review of the ALJ's assessment of the plaintiff's RFC is deferential, and

that RFC assessment will not be set aside if it is supported by substantial evidence." Black v. Berryhill, No. 16-1768, 2018 WL 4189661 at *3 (M.D. Pa. Apr. 13, 2018).

Applying the above standard to the present record, the Court finds substantial evidence to support the ALJ's RFC determination. Here, the ALJ considered Gregorio's physical and mental impairments in crafting the RFC, including Gregorio's degenerative disc disease, fibromyalgia, and diabetes. (Tr. 18). The ALJ explained, however, that despite evidence of severe physical impairments, the objective medical evidence revealed no objective evidence to support Gregorio's claims of pain and limitation. (Tr. 21-24). The ALJ explained that EMG studies indicated normal findings. (Tr. 21). Similarly, the ALJ detailed Gregorio's testimony and allegations regarding other conditions which he did not find to constitute severe impairments and articulated that those allegations were not supported by the objective evidence, as noted above. The ALJ considered the opinion evidence of record, including the findings of Dr. Miller, and the opinions of Dr. Long and Dr. Wilson. (Tr. 22-24). The ALJ, however, was confronted by a record marked by inconsistencies regarding Gregorio's subjective allegations and objective findings on examination, on MRI and on electrodiagnostic testing. Despite those inconsistencies and the inconsistencies in Gregorio's testimony, the ALJ found her to be partially credible and limited Gregorio to a full range of light work, a finding

which drew support from substantial evidence in this highly equivocal factual record.

This RFC determination, in turn, led to the ALJ denying Gregorio's claim both at Step 4, finding that she could return to her past employment, and at Step 5, finding that there were other jobs in the national economy she could perform. That Step 5 determination rested, in part, upon the ALJ's conclusion that Gregorio could communicate in English and, while the record on this score was also marked by conflicting evidence, substantial evidence in the form of Gregorio's English proficiency results at the time of her naturalization supported the factual determination.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential

standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.    **<u>Conclusion</u>**

Accordingly, for the foregoing reasons, IT IS ORDERED that the final decision of the Commissioner denying these claims is AFFIRMED.

An appropriate order follows.

<u>/s/ *Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge


Submitted this 16th day of September 2021.

51